# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

| | |
|---|---|
| KIMBERLY ACHORS, | |
| Plaintiff, | |
| vs. | CAUSE NO. 1:15-cv-2052-SEB-MPB |
| FCA US, L.L.C., | |
| Defendant. | |

## ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
### [doc. 34]

Plaintiff Kimberly Achors claims that her employer, defendant FCA US, L.L.C., is liable to her for various violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq*. FCA moves for summary judgment on all of Ms. Achors's claims and its motion is now fully briefed and ready for decision. For the reasons explained herein, the motion is granted despite a denial in part on a single underlying, nondispositive issue..

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute about a material fact is genuine only if, on the presented evidence, a reasonable jury could return a verdict for the nonmoving party," *id.*, at 248.

"As the '"put up or shut up" moment in a lawsuit,' summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of Indiana University*, No. 16-1958, 2017 WL 3753996, *4 (7th Cir., August 31, 2017). "If there is no triable issue of fact on even one essential element of the nonmovant's case, summary judgment is appropriate." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A court construes the cited evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). However, the non-moving party "is not entitled to the benefit of inferences that are supported only by speculation or conjecture." *Boss*, 816 F.3d at 916. A court does not weigh the evidence or determine credibility because those tasks are reserved for the fact-finder at trial. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

## I. Undisputed facts

Except as specifically noted, the following facts have been established by the parties through citations to admissible evidence in the record and have not been genuinely disputed by cited evidence or they have been admitted in the parties' pleadings. Fed. R. Civ. P. 56(c)(1)(A); *Perez v. El Tequila, L.L.C.*, 847 F.3d 1247, 1254 (10th Cir. 2017).

FCA hired Ms. Achors on March 7, 1994. *Complaint and Demand for Jury Trial* [doc. 1] ("*Complaint*"), ¶ 10; *Defendant's Answer and Affirmative Defenses* [doc. 15]

("*Answer*"), ¶ 10. Ms. Achors was first assigned to a transmission assembly line where she continued to work until 2001. *Defendant's Brief in Support of Motion for Summary Judgment* [doc. 35] ("*Defendant's Brief*"), Statement of Material Facts Not in Dispute ("SMF"), at 5. The parties dispute the specific title of Ms. Achors's job but they do not dispute that she actually performed assembly-line work.

In 2001, Ms. Achors experienced a seizure and was diagnosed with Tardive dyskinesia, a disorder that results in seizures occurring on average once a month.[1] The medical statement that she submitted to FCA restricted her from working in close proximity to moving parts and flashing lights, which meant that she no longer could work on or around the assembly line. These restrictions were continuously in effect during her employment. *Defendant's Brief*, SMF, at 5. For the next fourteen years, FCA assigned her to jobs that complied with her medical restrictions. *Id.* Ms. Achors testified that FCA was "pretty good and found me a lot of jobs" that all complied. *Id.*, at 5-6. No one at FCA questioned or rejected her medical restrictions. *Id.*, at 5-6.

After her seizure and submission of medical restrictions in 2001, Ms. Achors was off work for several months. Following another seizure in 2012, FCA placed her on "Code 31" status, which meant that she remained on the employment rolls despite there being no work for her and she was paid approximately ninety percent of her normal

---

[1] Ms. Achors testified that, earlier in 2001, she also was diagnosed with anxiety, depression, and bipolar disorder, *Defendant's Brief, Exhibit A*, Excerpts of Deposition of Kimberly Achors [doc. 35-1] ("*Achors Dep.*"), at deposition p. 40-41; see also *Complaint*, ¶ 12, and that her Tardive dyskinesia started soon after as an almost immediate reaction to an anti-depressant medication that she had started taking to treat some or all of those mental disorders, *Achors Dep.*, p. 33.

wage.  She remained on Code 31 status for two years, from 2012 to October 2014, until

FCA called her back because it found work that she could perform.  *Plaintiff's Brief in*

*Opposition* [doc. 60] ("*Response*"), Plaintiff's Statement of Additional Material Facts

("SAMF"), at 4, ¶ 2; *Defendant's Reply* [doc. 63] ("*Reply*"), Response to Plaintiff's

Statement of Additional Material Facts ("RSAMF"), at 6, ¶ 2; *Defendant's Brief, Exhibit A*,

Excerpts of Deposition of Kimberly Achors [doc. 35-1] ("*Achors Dep.*"), at deposition pp.

67-69.

    **Mr. Larrison's alleged comments.**  Myron "Mike" Larrison was "the Joint Team

Leader Selection Committee for the Kokomo Transmission Plant" (a union-appointed

position) and a co-worker of Ms. Achors.  They did not actually work together but

occasionally saw each other in the outdoor smoking area during breaks and while

walking around the plant.  *Defendant's Brief*, SMF, at 7.  Before October 15, 2014, Mr.

Larrison made certain unwelcome comments to Ms. Achors.   The first such comment

occurred after she returned to work in October 2014 following her Code 31 status.

While conversing with other employees in the smoking area on a hot day, someone

mentioned that popsicles were not brought around and Ms. Achors expressed surprise

and said that "[w]e never got Popsicles" (before her Code 31).   Mr. Larrison responded,

"Well, how would you know?  You never come to work, you know, you've always been

on sick leave."  *Response*, SAMF, at 4, ¶ 1; *Achors Dep.*, pp. 64-66.  He made additional,

similar comments prior to October 15, 2014:  (1) he commented about her being in the

hospital, (2) he said that she is a "mental patient," (3) he asked her husband, "How

could you stay with her?  She's a bitch," and (4) he asked her husband, "How could you stay with her when she's crazy."  *Id.*, at 4, ¶ 3; *Achors Dep.*, p. 72.  Ms. Achors testified that Mr. Larrison made many such comments to her, "one after another."  *Achors Dep.*, p. 72.

According to Ms. Achors, on October 15, 2014, she and Mr. Larrison attended a fundraiser at the plant and were present in the dunk tank area.  In return for a five dollar donation, a thrower received five balls to throw at the tank.  Mr. Larrison was getting ready to get in the dunk tank when Ms. Achors said to others that she would donate ninety dollars to anyone who could dunk him.  Ms. Achors testified that, after someone told Mr. Larrison what she had said, he approached her and said, "Yeah, well I know somebody that would give $2,000.00 if you go home and shoot yourself in the head."  *Defendant's Brief*, SMF, at 7; *Achors Dep.*, pp. 72-73.[2]  On October 21, 2014, Ms. Achors reported Mr. Larrison's alleged October 15, 2014, comment to James Smith, an FCA Labor Relations representative at the time, and Mr. Smith investigated.  He interviewed Mr. Larrison, who denied making the statement, and two witnesses whom Ms. Achors had identified as having heard the comment, but those witnesses denied hearing it.  No disciplinary action was taken against Mr. Larrison.  *Response*, SMF, at 7-8.

Ms. Achors testified that, after she had reported Mr. Larrison's comment to Mr. Smith, Mr. Larrison said to her in passing, "You was stupid.  That was about dumb of

---

[2] Mr. Larrison's version of this event was significantly different.  *Defendant's Brief*, Exhibit D, Excerpts of Myron Larrison, Jr.'s Deposition [doc. 35-4], at deposition pp. 23-27.

you to do something like that." *Response*, SAMF, at 4, ¶ 4; *Achors Dep.*, pp. 78-79. Mr.

Larrison has testified that he did not make the comment. *Defendant's Brief*, SMF, at 8 n.

1.

 **November 11, 2014, incident.** On November 11, 2014, Ashley Baugues, a Safety

Specialist at the Kokomo Transmission Plant, told Deidre Fultz, a Manufacturing

Manager, to find a job for Ms. Achors that would accommodate her medical restrictions.

Before this date, Ms. Fultz had not met or interacted with Ms. Achors, and she was

unaware of her restrictions and previous accommodations. Ms. Baugues explained Ms.

Achors's restrictions to Ms. Fultz and Ms. Fultz responded that they could create an

accommodating work area where Ms. Achors would be prevented from having to see

moving objects. Ms. Fultz helped set up the workstation where Ms. Achors would be

performing her new job of taking parts out of a tub and placing them into a cart to be

taken to the assembly line. Curtains were installed to block Ms. Achors's view of

"vehicular traffic" (apparently, motorized carts driven by employees), and she was

supplied with an ergonomic chair. In performing these tasks, Ms. Achors was able to

face toward the wall. *Defendant's Brief*, SMF, at 8-9.

 When Ms. Achors arrived at her work area, she questioned why the curtains

were placed to block the aisleway but would not block her view of a moving conveyor

belt, which she claimed would be visible when she would turn to retrieve parts from

the tubs. Ms. Achors testified that Ms. Fultz responded that the aisleway was screened

so that other employees would not stop their passing carts and talk to her, and that she

should not worry about viewing the conveyor belt, since she was to stare at the wall. Because this would entail her having such a limited view, Ms. Achors asked that her union steward be called. *Defendant's Brief*, SMF, at 9; *Response*, Statement of Disputed Material Facts ("SDMF"), at 3; *Achors Dep.*, pp. 86-87.

Ms. Achors testified that, at that point, a heated altercation commenced between her and Ms. Fultz, with Ms. Fultz screaming at her and spit getting on her face and in her mouth. Ms. Achors told Ms. Fultz to "get the f out of my face." *Defendant's Brief*, SMF, at 9; *Response*, SDMF, at 5, ¶ 10; *Reply*, RSAMF, at 9, ¶ 10; *Achors Dep.*, p. 87. Ms. Fultz asked Ms. Achors to get on her cart to go to Labor Relations and Ms. Achors refused. Ms. Fultz called security. Security officers arrived and asked for Ms. Achors's badge. She refused to give it to them and told them not to touch her. Ms. Achors's union committeeman and union steward arrived at the area, as did Mr. Smith and his boss, Doug Lutes, the Labor Relations Supervisor. Mr. Lutes asked for Ms. Achors's badge and she complied. Either the union committeeman and steward walked her out of the Plant, *Defendant's Brief*, SMF, at 10; *Achors Dep.*, pp. 87-89, or security escorted her out, *Fultz Dep.*, p. 23.

Ms. Achors was indefinitely suspended as a result of the incident. Ms. Fultz and Mr. Smith denied making the decision to suspend her. Consistent with standard practice at the plant in cases of suspension, Ms. Achors's union grieved the suspension and Mr. Smith investigated the incident as part of the grievance process. He considered

a statement written by Ms. Fultz and signed by her and Ms. Baugues[3] and he interviewed other witnesses. Ms. Fultz's statement related that Ms. Achors screamed and yelled throughout the incident; engaged in threatening behavior; and refused to surrender her badge to security before finally handing it to Mr. Lutes. An agreement was reached between FCA and the union whereby Ms. Achors's indefinite suspension was amended to allow her to return to work on January 20, 2015. *Defendant's Brief*, SMF, at 10-11; *Response*, SDMF, at 3.

## II. Discussion

In her response, Ms. Achors has abandoned her claims under the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, *Complaint*, Count Two, and her ADA claims based on her termination, *id.*, Count One ¶¶ 50, 52, and last clause of 51. *Response*, at 1 n. 1. What remain are three claims under the ADA: (1) FCA failed to provide her with reasonable accommodations for her Tardive dyskinesia; (2) FCA's suspension of her in November 2014 because of her disability, her requests for accommodation, and/or her complaint of harassment because of her disability; and (3) FCA subjected her to a hostile work environment because of her disability. *Response*, at 7.

### A. Reasonable accommodation.

The elements of a failure-to-accommodate claim under the ADA are: (1) the

---

[3] Ms. Fultz had Ms. Baugues review and sign Ms. Fultz's statement because Ms. Baugues "was the safety specialist who brought [Ms. Achors] to my office and asked me to create a work environment . . . ." *Fultz Dep.*, p. 29. At her deposition, Ms. Fultz stated that she thought Ms. Baugues also was present during the incident but honestly could not recall. *Id.* The statement does not state that Ms. Baugues was present. Ms. Achors disputes that Ms. Baugues was present.

plaintiff is a qualified individual with a disability; (2) her employer was aware of her disability; and (3) her employer failed to reasonably accommodate her disability. *Equal Employment Opportunity Commission v. Autozone, Inc.*, 809 F.3d 916, 919 (7th Cir. 2016). There is no dispute for purposes of the present motion that Ms. Achors has a disability and that FCA was aware of it. Ms. Achors claims that FCA failed three times to reasonably accommodate her Tardive dyskinesia: (1) a job created for her in 2012 involved moving machinery; (2) the workstation created by Ms. Fultz on November 11, 2014, allowed Ms. Achors to see the moving conveyer line; and (3) in an unspecified manner, FCA failed to accommodate her during her disciplinary suspension from November 11, 2014, to January 20, 2015.

FCA makes an initial, general argument that Ms. Achors is not a "qualified individual." A "qualified individual" is a person who, "with our without reasonable accommodation, can perform the essential functions of their employment position," 42 U.S.C. § 12111(8), which are the fundamental job duties of the position, as opposed to the marginal functions, 29 C.F.R. § 1620.2(n)(1). FCA contends that Mr. Achors was hired "as an assembly employee" and that she worked "normal assembly line jobs" until she submitted her medical restrictions in 2001. *Defendant's Brief*, SMF, at 5. In support, it cites Ms. Achors's testimony that the position for which she was hired was an "Assembly" position; that "it was just an assembly line" for transmissions, *Achors Dep.*, p. 16; and that, before her diagnosis, she was doing "[j]ust normal jobs" on an assembly line, *id.*, at p. 34. FCA argues that, because Ms. Achors cannot show that she

can perform her "normal" assembly-line job with or without reasonable accommodation, she was not a qualified individual with a disability and, therefore, cannot prove that FCA failed to reasonably accommodate her disability.

In this litigation, Ms. Achors disputes that she was an assembly-line employee. She contends that she "was hired as a[n] hourly employee, a team member" and that FCA referred to her as "an hourly production team member." *Response*, SDMF, at 2.  In support, she cites several items of evidence:  (1) Mr. Smith's answer, when asked her position was when he first met her in 2014, that "[s]he's an hourly employee, a team member." *Plaintiff's Appendix of Evidence* [doc. 59] ("*Plaintiff's App.*"), Exhibit 1, Excerpts from the Deposition of James Smith [doc. 59-1] ("*Smith Dep.*"), at p. 36; (2) FCA's answer when it was asked to identify dates and title for each position that Ms. Achors held, that she "was an hourly production team member during her entire employment," *Plaintiff's App.*, Exhibit 2, Defendant's Answer to Interrogatory no. 8 [doc. 59-2]; (3) Ms. Achors's testimony that she performed jobs such as inspector and part-deburrer, which occurred away from the assembly line, *Response*, at 2; *Achors Dep.*, p. 19; and (4) evidence that those jobs would have been performed by other hourly employees if she had not performed them, *Achors Affidavit*, ¶ 5; *Response*, Exhibit 4, Excerpts from Deposition of Yvonne Dean [doc. 59-4] ("*Dean Dep.*"), p. 5.

Ms. Achors's point appears to be that, because the job for which she was hired included some non-assembly-line functions, it was not strictly an "assembly-line" job and she *was* qualified to perform it because she could still perform the non-assembly-

line functions. However, significantly, she does not assert or cite supporting evidence that assembly-line work was not a substantial part of her job or that any other employee hired for her position exclusively performed non-assembly-line work. She, moreover, does not explain or cite any evidence showing why her cited labels of "hourly employee," "team member," or "production team member," are necessarily inconsistent with FCA's cited labels of "assembly employee" or "assembly line job," or with a job whose essential functions are performed primarily or substantially on an assembly line.

We note that the parties have not presented what should have been easily obtained, and more convincing, evidence of the essential functions of the job for which Ms. Achors was hired and which she actually performed. For example, written job descriptions and affidavits or declarations from co-workers, supervisors, and human resources describing her job would have been informative and helpful. However, taking the evidence and arguments that have been presented relating to the present motion, we conclude that FCA has shown, primarily from Ms. Achors's own descriptions and admissions,[4] that an essential function of her initial job was assembly-line work and Ms. Achors has not shown that there is a genuine dispute about that fact. Ms. Achors has not alleged or argued that there were reasonable accommodations that would have permitted her to perform her assembly-line job and she has not shown that FCA had vacant, permanent positions to which it could have transferred her as a

---

[4] The Court also notes that, in her affidavit, Ms. Achors distinguishes between "assembly departments," in which she worked before her restrictions, and "production departments," to which she was lent out after her restrictions and which "consist of jobs away from the assembly lines, and are not assembly departments." *Achors Affidavit*, ¶ 4.

reasonable accommodation. Thus, if the job for which the ADA requires FCA to provide reasonable accommodation is Ms. Achors's original assembly-line job, then there is no genuine dispute that she was not a qualified individual with a disability.

However, there is a genuine issue of fact about the precise job that FCA was required to accommodate. Ms. Achors was diagnosed with Tardive dyskinesia and submitted her medical restrictions in 2001. FCA has not questioned her diagnosis or her restrictions. For twelve years, FCA assigned Ms. Achors to a series of jobs away from the assembly line that complied with her restrictions. She was off work for approximately three months in 2001, after her initial seizure and submission of restrictions, and she was off for approximately two years from 2012 to 2014 on the "Code 31," during which she received approximately ninety percent of her wage. *Response*, SAMF, at 4 ¶ 2; *Reply*, RSAMF, at 6 ¶ 2. As noted above, FCA called her back to work when they found work for her to do. Thus, for fourteen years, from her notice of disability in 2001 to her termination in April 2015, FCA maintained Ms. Achors on the payroll, mostly while working and all of that work in non-assembly positions.

Ms. Achors testified that she was "more or less called a float" throughout the time she was employed after her diagnosis and restrictions. *Achors Dep.*, pp. 18-19. She performed a series of temporary assignments, *e.g.*, inspector, deburrer, machineries work, machine counts, office computer work. *Id.*, pp. 16-22, 70-71. She testified that FCA did a good job of finding work for her that complied with her restrictions. *Id.*, pp. 24, 34. She did not bid on a permanent position through the union during this time but

only continually worked a series of positions. *Id.*, at 18. Ms. Achors contends that she was qualified to (and actually did) perform, with or without reasonable accommodation, all of the jobs that she performed during her fourteen years from 2001 to her termination.

FCA argues that, while it found various positions for Ms. Achors to perform that met her restrictions, it "was under no obligation to find these light duty positions for Achors on an indefinite basis." *Defendant's Brief*, at 15. Although FCA is correct that the ADA does not require an employer to create a new job for a disabled employee as a reasonable accommodation, *Severson v. Heartland Woodcraft, Inc.*, No. 15-3754, 2017 WL 4160849, *4 (7th Cir., Sept. 20, 2017); *Stern v. St. Anthony's Health Center*, 788 F.3d 276, 291 (7th Cir. 2015), it can be a question of fact whether an employer has, in fact, done so, *see*, *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 697-98 (7th Cir. 1998); *Razote v. Potter*, 833 F.Supp.2d 913, 917-18 (N.D. Ill. 2011); *Vojaskovic v. Premier Manufacturing Support Services*, No. 1:05-cv-116-TAB-DFH, *Entry on Defendant's Motion for Summary Judgment*, 2006 WL 1594509, *3-5 (S.D. Ind., June 6, 2006).

In the present case, while there is no suggestion or evidence in the record that FCA has a formal light-duty program for temporarily disabled employees to continue working on the payroll until their restrictions are lifted, the undisputed evidence is that FCA employed Ms. Achors for fourteen years after she became disabled and continuously assigned her work as a "floater" for twelve of those years. It might not have been a formally designated permanent job, open for union bidding, and FCA

might not have consciously considered whether it should be so designated and might always have believed that it was not obligated to keep Ms. Achors employed, but it did, in fact, so employ her for fourteen years, in positions that met her restrictions.[5]

In these circumstances, we conclude that it is a genuinely disputed fact question whether FCA's assignment of Ms. Achors to the floater position for fourteen years "must be treated as a reassignment to a permanent job for purposes of accommodation." *Hendricks-Robinson*, 154 F.3d at 697. There is no evidence that the float job that Ms. Achors performed had the nature of a temporary, short-term light-duty job to which FCA voluntarily transferred her until she either recovered from her disability or a different permanent job became vacant. There is no evidence that FCA ever described the job in those terms to Ms. Achors. The fact that her floater job persisted for fourteen years — long after any characterization of the job as temporary or short-term was reasonable, long after any idea of recovery[6] and return to the assembly-line was practical, and presumably after several permanent positions had become vacant — is a strong indication that it was not a temporary, stop-gap assignment. If the factfinder were to find that Ms. Achors's job, for ADA purposes, was her floater job, then that is the job for which she must be a qualified individual and which FCA was required to have provided reasonable accommodation, not her original assembly-line

_____

[5] "The evidence overwhelmingly shows that FCA US accommodated Achors for 14 years." *Reply*, at 13.

[6] The Court notes that Ms. Achors testified that, pursuant to FCA's policy, her disability had been re-evaluated every six months since it was diagnosed and, each time, the medical restrictions were confirmed throughout her employment. Neither side described Ms. Achors' prognosis as far as her Tardive dyskinesia, whether recovery is possible and when or whether it is a permanent disorder.

job that she stopped performing over fourteen years earlier.

Viewing the evidence in the light most favorable to Ms. Achors and drawing all reasonable inferences in her favor, the Court concludes that there is a genuine dispute of fact that is material to the issue of whether she is a qualified individual with a disability and that FCA is not entitled to summary judgment on that issue. However, after analyzing the other elements of her claims, we conclude that Ms. Achors cannot survive summary judgment.

**1. 2012 incident.** Ms. Achors argues that a particular job workstation that was set up for her in 2012 involved an assembly line and moving machinery. She alleges that, when she pointed out that the workstation did not comply with her restrictions, the responsible safety specialist disagreed and told her that she would have to work the job or be fired. She worked the job, suffered another seizure, and was off work on the "Code 31" for two years. *Response*, SAMF, at 5, ¶ 6.

Ms. Achors cannot assert any claim based on this incident because she did not plead it in her *Complaint*, *Connor v. Illinois Dept. of Natural Resources*, 413 F.3d 675, 680 (7th Cir. 2005), and because it falls outside the scope of her EEOC charge.[7] Her charge was filed on April 8, 2015, *Complaint*, ¶ 37, which places the 2012 incident well beyond the 300-day window for filing an EEOC charge, 42 U.S.C. § 2000e-5(e)(1); *Majors v. General Electric Co.*, 714 F.3d 527, 536 (7th Cir. 2013) ("A charge filed beyond the 300-day

---

[7] Ms. Achors cannot (and does not) allege that this 2012 incident is only one part of a continuing pattern or practice by FCA of failing to accommodate because, as noted above, she testified that FCA did a good job of finding her jobs that complied with her restrictions.

period is untimely and barred.").

   **2. November 11, 2014, incident.**  Ms. Achors argues that "[i]t is undisputed that Defendant failed to accommodate Achors on November 11, 2014 . . . ."  *Response*, at 9. This is the date on which she was introduced to the workstation prepared by Ms. Fultz that led up to their altercation and resulted in Ms. Achors's suspension.  She did not explain the basis of her claim but we presume that she contends that the workstation failed to accommodate her disability because it failed to screen the moving conveyor line from her view.[8]  FCA did not directly respond to this argument, apparently relying only on its general argument that, because Ms. Achors was not a qualified individual, it had no obligation to accommodate her disability.  We rejected this argument above.

   However, Ms. Achors's claim still does not survive.  Regardless of whether Ms. Achors's, FCA's, or another version of the facts of the November 11, 2014, altercation is credited, it is undisputed that Ms. Achors never worked the job for which the workstation was created.  According to both sides' versions, the altercation between Ms. Fultz and Ms. Achors began almost immediately after Ms. Achors arrived at the workstation, and Ms. Achors was ultimately ejected from the plant and suspended for approximately two months after her outburst.  There is no evidence that, when she

---

[8] FCA does not argue, as it did with regard to the 2012 incident, that Ms. Achors did not plead this claim, although it appears that she did not.  Regarding this 2014 incident, the *Complaint* initially alleges that Ms. Achors accepted, as an accommodation, the job that was offered to her on November 11, 2014, *Complaint*, ¶ 23, and then it alleges circumstances of the altercation that quickly transpired between her and her supervisor and Ms. Fultz, *id.*, ¶¶ 24-27, without any mention of insufficient screening or a request for further accommodation.  Because Ms. Achors does not elaborate in her *Response* on the nature of her claim, the Court speculates as best as it can.

returned, she ever worked at the workstation in issue.  Because she separately claims that FCA's suspension was discriminatory and retaliatory, her claim here is solely that FCA failed to set up the workstation in compliance with her restrictions.[9]  If Ms. Achors was suspended because of anti-disability discrimination or retaliation, it was not because the workstation curtains did not screen the conveyor line.

We hold that Ms. Achors's claim that the November 11, 2014, workstation did not reasonably accommodate her disability is untenable on the facts before us because she was suspended before even working at the workstation and she did not return to it.

**3. Suspension from November 11, 2014, to January 20, 2015.**  Ms. Achors argues that "[i]t is undisputed that Defendant failed to accommodate Achors . . . during her suspension from November 11, 201[4] to January 20, 2015." *Response*, at 9.[10]  She does not explain how FCA could have accommodated her work restrictions when she was away from work during her suspension and the Court cannot imagine what such an accommodation might be.  She has a separate claim, addressed below, that her suspension was the result of unlawful discrimination and retaliation.  Therefore, we reject Ms. Achors's claim that FCA failed to accommodate her disability during her suspension.

_____

[9] Ms. Achors did not allege and does not argue that FCA intentionally set up a non-compliant workstation in order to create or catalyze the altercation in service of a scheme to manufacture a justification for dismissing her.  Neither Ms. Achors's pleadings nor her arguments here fairly include such an allegation.  At any rate, shoehorning such an allegation into a failure-to-accommodate claim is awkward when her discrimination/retaliation claim appears to be a more natural fit.

[10] This claim as stated in the *Response* also appears not to have been pled.

**B. Hostile work environment.**

Ms. Achors claims that FCA created a hostile work environment for her as a disabled person who had invoked her rights under the ADA. *Complaint*, Count One, ¶ 49. She relies on two incidents of harassment: first, comments made by Mr. Larrison to her,[11] and, second, her altercation with Ms. Fultz at her new workstation on November 11, 2014, which resulted in her suspension, *id.*, ¶¶ 23-27. Both incidents are described above.

We assume, without deciding, that a hostile work environment is actionable under the ADA and that the standard for that claim is the same as under Title VII. See *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005) (the court of appeals has not decided whether such a claim exists).

> A hostile work environment exists where an employee experiences harassment that is "so severe or pervasive as to alter the conditions of employment and create an abusive working environment." A plaintiff establishes an alteration in the terms and conditions of employment by demonstrating either a tangible employment action, such as discharge or demotion, or a non-tangible action, such as discriminatory conduct that is so severe or pervasive as to create an "abusive" working environment. Furthermore, the plaintiff must demonstrate that the workplace was both subjectively and objectively hostile. An objectively hostile environment is one that a reasonable person would find hostile or abusive.

*Id.*

According to Ms. Achors's testimony, she did not work with Mr. Larrison, did

---

[11] The Complaint alleges only the October 15, 2014, comment by Mr. Larrison at the fundraiser. *Complaint*, ¶ 18. It alleges simply that Mr. Larrison told her "to go home, put a gun to her head and shoot herself." *Id.* The evidence adduced on the present motion provides a different version of that event, as described above. In addition, on the present motion, Ms. Achors's argument includes the additional comments by Mr. Larrison described in the text.

not know what his job was, and encountered him only in passing in the plant and in the outside smoking area during breaks. She testified to only a handful of brief comments that he made to her over a short time period, after she returned to work from her two-year "Code 31." It appears that all of his comments, before her report to Labor Relations, were made only during a part of October 2014. *Achors Dep.*, pp. 63-66, 72-73. On October 21, 2014, Ms. Achors reported Mr. Larrison's fundraiser comment to Labor Relations, including in that report some reference to his earlier comments (she did not report those comments before), and stating that she believed that his comments were related to her disability. Labor Relations investigated her report but determined that Mr. Larrison denied making the comment, *Smith Dep.*, pp. 9, 46, and Ms. Achors's two identified witnesses to the fundraiser comment did not corroborate her report, *id.*, p. 9. She has not asserted any deficiency in FCA's investigation or its handling of Mr. Larrison's alleged harassment otherwise. She testified that, at some time after the investigation, Mr. Larrison made an unspecified number of passing remarks to her in the workplace about her complaint to Labor Relations, but she did not report them to FCA. *Achors Dep.*, pp. 78-79.

The limited number of brief comments, made over a brief time period, by Mr. Larrison, who did not work with Ms. Achors and whom she saw only periodically and in passing, were not objectively severe or pervasive enough to alter the terms and conditions of Ms. Achors's employment or to create an abusive work environment. In addition, by not alleging or arguing any deficiency in FCA's response to her reports of

Mr. Larrison's comments, Ms. Achors has not shown any factual or legal basis for a reasonable jury to find that FCA is liable for creating or maintaining a hostile work environment.

Likewise, Ms. Achors's claim that Ms. Fultz was hostile to her during their altercation at the workstation on November 11, 2014, describes an *incident*, not a pervasively or severely hostile or abusive work *environment* that altered the terms or conditions of her employment. Moreover, Ms. Achors's argument that her suspension proves that the terms and conditions of her employment were altered is incorrect. There is no evidence that Ms. Achors was suspended because Ms. Fultz was hostile; rather, Ms. Achors was suspended, according to FCA, because she was insubordinate and belligerent or, according to Ms. Achors, because FCA retaliated against her because of her disability, accommodation request, or disability complaint. Finally, Ms. Achors's argument that Ms. Fultz's alleged hostility should be considered in conjunction with Mr. Larrison's alleged hostility in order to establish a pervasive hostile environment at FCA is unconvincing because she does not assert or prove any facts or circumstances that establish a connection between the two incidents.

There is no genuine dispute of material fact and FCA is entitled to judgment as a matter of law on Ms. Achors's claim of a hostile work environment.

### C. Discrimination and retaliation.

Ms. Achors next claims that FCA suspended her on November 11, 2014 because she is disabled and because she requested accommodation, engaged in the interactive

process, and/or complained about FCA's discrimination and retaliation. Her version of events, as related in her deposition testimony, is that she told Ms. Fultz that she would work the job that Ms. Fultz had set up for her but that, when she arrived at the workstation site and commented that she could still see a moving conveyor line and requested her union steward, Ms. Fultz immediately became agitated with her, told her that she could stare at the wall for ten and on-half hours, started screaming and spitting at her, and accused her of thinking that she could get any job that she wanted. *Response*, at 9-10. Ms. Achors contends that this behavior shows animosity and prejudice against her because she is disabled and because she was requesting an accommodation. *Id.*, at 10. To prove disability retaliation, Ms. Achors must prove that she suffered an adverse employment action because she engaged in protected activity, namely requesting an accommodation or complaining about disability discrimination. *See* Lord *v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).

Under the "cat's paw" theory of *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), Ms. Achors contends that the statement that Ms. Fultz wrote for Labor Relations after the incident caused it to suspend her and, therefore, Ms. Fultz's retaliatory animosity against her was a motivating factor for her suspension. She argues that "[t]here is no evidence in this case that labor relations relied on *anything but* Fultz's statement," *Response*, at 11, and that "[a] jury could reasonably determine that Fultz was biased against Achors for requesting an accommodation and seeking to engage in the interactive process, and that Fultz's report was a motivating factor, if not the cause of

Defendant's retaliatory decision to suspend Achors," *id*.

The versions of the incident related by Mr. Smith and Ms. Fultz differ significantly from that of Ms. Achors. *Smith Dep.*, pp. 10-11, 38-41; *Smith Declaration*, ¶ 5; *Fultz Dep.*, pp. 20-31. These versions depict Ms. Achors, upon arriving at the workstation, immediately rejecting it and becoming belligerent, screaming and yelling, being insubordinate, and refusing repeated direct orders from supervisors, Labor Relations, and security to calm down, to accompany them to Labor Relations, to surrender her badge, and to leave the plant. While neither side cited evidence of who ultimately made the decision to dismiss Ms. Achors, the deposition testimony adduced by FCA shows that the it was made during the incident, possibly by Ms. Achors's immediate supervisor or the head of security.

FCA argues several facts and circumstances that tend to show that Ms. Fultz was not in any way antagonistic to Ms. Achors on account of her disability or request for accommodation: for example, Ms. Fultz had never met or interacted with Ms. Achors before, she did not know that her medical restrictions were longstanding, and she set up the workstation to comply with her restrictions. At best, FCA's evidence and inferences might support an inference that Ms. Fultz was angry because Ms. Achors was rejecting the accommodation that was designed for her, not because she was requesting more accommodation. FCA also argues that there is no evidence that Ms. Fultz decisively influenced the suspension decision because (1) her written statement was submitted only after Ms. Achors was suspended, (2) the statement was considered

by Labor Relations only in relation to the union's subsequent grievance of the suspension, (3) other employees witnessed and reported Ms. Achors becoming belligerent, aggressive, and insubordinate during the incident, and (4) Ms. Achors admitted being insubordinate (*e.g.*, by using profanity with Ms. Fultz, refusing to go to the Labor Relations office, and refusing to surrender her badge). *Defendant's Brief*, at 22-24.

While this constellation of allegations and evidence regarding the circumstances of the November 11, 2014, incident presents many factual disputes that ordinarily would be reserved for the trier of fact, evidence of a critical fact is missing. The ultimate issue is whether FCA, by suspending Ms. Achors, discriminated and retaliated against her. Ms. Achors has presented no evidence of who made the decision to suspend her, why that decision was made, and what information was considered. Both Mr. Smith and Ms. Fultz deny making the decision,[12] and Mr. Smith said that he considered Ms. Fultz's written statement only after Ms. Achors had been suspended, as part of his investigation of the union's grievance. Without evidence of the crucial facts relating to the decision-maker, Ms. Achors's cats-paw theory and her reliance on Ms. Fultz's alleged animosity toward her disability and/or to her accommodation requests are irrelevant.

---

[12] Mr. Smith testified the dismissal or suspension decision already had been made or was in process by the time he arrived at the scene and that he had no involvement in ordering Ms. Achors to leave the plant. *Smith Dep.*, p. 40; *Smith Declaration*, ¶ 5. Ms. Fultz denied making the decision to suspend and thought that Labor Relations had made it. *Fultz Dep.*, p. 25.

Mr. Lutes, Labor Relations manager, was on the scene at the workstation, *Fultz Dep.*, p. 22, 23, 27, as was Steve Degenkolp, the area supervisor,[13] who apparently was on site from the beginning of the altercation, *id.*, pp. 19-21. This at least places them as well within the group of possible decision-makers. In addition, according to Ms. Fultz, Jack Johnson, the head of security, was present and instructed Ms. Achors that refusal to surrender a badge on request is grounds for immediate dismissal, *Fultz Statement* [doc. 35-5], at 2, but Ms. Achors continued to refuse. Ms. Fultz testified that Mr. Lutes also instructed Ms. Achors that, contractually, she was required to surrender her badge when requested by security to do so, but she continued to refuse. *Fultz Dep.*, p. 23. Ms. Fultz also stated that Mr. Johnson eventually ended the altercation, saying "enough is enough" and "this has gone on way too long, she needs to leave," and directing security to escort her off the premises. *Fultz Dep.*, p. 23. When Mr. Lutes told Ms. Achors to either return to work or be dismissed and she refused to return to work, Mr. Johnson declared that it was way past the point of her staying on the job due to her refusals to hand over her badge. After asking her three times for her badge, Ms. Johnson instructed security to take her out without her badge. *Fultz Statement*, at 2. These portions of the submitted evidence are cited only to show that there were more persons present during the November 11, 2014, incident than Mr. Smith and Ms. Fultz, any of whom could have had the authority to dismiss or suspend Ms. Achors based on their

---

[13] Ms. Fultz declared that Mr. Degenkolp told Ms. Achors during the incident that he was her "immediate supervisor" and gave her a direct order to go to Labor Relations. *Fultz Statement* [doc. 35-5] at 1.

own observations and reports from others.

Ms. Achors's failure to adduce any evidence of the decision-maker for her suspension is fatal to her claim. Accordingly, we conclude that she has not shown a genuine dispute of fact material to her claim of disability discrimination and retaliation as a result of her suspension and that FCA is entitled to judgment as a matter of law on those claims.

### III. Conclusion

*Defendant's Motion for Summary Judgment* [doc. 34] is **GRANTED** as to all of Ms. Achors's claims. Because she abandoned her claims under the Family Medical Leave Act and her ADA claim, they will be included in the judgment as well.

**SO ORDERED:**

Date: _____9/29/2017_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution to all ECF-registered counsel of record *via* ECF-generated e-mail.